## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

NATALIE RUFFIN-TRAYLOR,

              Plaintiff,

    and                                               Case No.

ALEX M. AZAR II,
SECRETARY OF DEPARTMENT OF
HEALTH & HUMAN SERVICES
c/o Gregory J. Haanstad, U.S. Attorney
517 East Wisconsin Avenue
Milwaukee, WI 53202,

ANDREA PALM,
SECRETARY-DESIGNEE OF
THE WISCONSIN DEPARTMENT OF HEALTH SERVICES
1 W. Wilson Street, Room 650
Madison, WI 53703,

                  Involuntary Plaintiffs,

    v.

KAREN LIND BUTLER, M.D.,
ADVANCED CORRECTIONAL HEALTH CARE, INC., a foreign corporation,
AUTUMN MERCER, R.N.,
JOANN MEDLEY, R.N.,
UNKNOWN NURSE EMPLOYEES OF VNCC/KVNA,
VISITING NURSE COMMUNITY CARE, INC., a domestic corporation,
KENOSHA VISITING NURSE ASSOCIATION, INC., a domestic corporation,
CORRECTIONAL OFFICER CK #12004,
UNKNOWN SHERIFF SUPERVISORS AND CORRECTIONAL OFFICERS
OF THE KENOSHA COUNTY SHERIFF'S DEPARTMENT,
KENOSHA COUNTY,
KELLY O'BRIEN, M.D.,
and
MARY LEMMENES, APNP,

                  Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Natalie Ruffin-Traylor, by her attorneys, Cannon & Dunphy, S.C. and Peterson Law and Mediation, LLC, states and alleges as follows:

### Introduction

1.     This is a civil rights action brought under 42 U.S.C. § 1983 concerning the Defendants' deliberate indifference in relation to the prolonged and obvious need for medical treatment for Ms. Ruffin-Traylor while she was in custody at the Kenosha County Jail ("KCJ") and Taycheedah Correctional Institution ("TCI").

2.     On December 14, 2013, Ms. Ruffin-Traylor suffered a displaced and fragmented bimalleolar fracture of her left ankle with some widening in spaces between the bones of her lower leg and ankle.

3.     Surgery was scheduled to reduce the fracture and stabilize her ankle joint, but before the surgery was completed Ms. Ruffin-Traylor was arrested and incarcerated on a probation hold.

4.     Ms. Ruffin-Traylor was confined at KCJ from January 13, 2014, until November 17, 2014, and at TCI from November 17, 2014, until December 22, 2015. Upon and during her incarceration, it was readily apparent that she had a left ankle fracture requiring medical care and attention. Due to the Defendants' actions and inactions, Ms. Ruffin-Traylor did not receive the necessary care, treatment, or attention, and her left leg was

2

ultimately amputated below the knee as a direct result of the Defendants' actions and inactions.

5.    The Plaintiff now seeks damages for the substantial pain and suffering and medical expenses incurred as a result of the Defendants' conduct.

**Jurisdiction and Venue**

6.    This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1367(a).

7.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

**Parties**

8.    Ms. Ruffin-Traylor was born March 10, 1964, and is an adult resident of the State of Wisconsin, currently residing in Milwaukee County, Wisconsin. At all material times, she was an inmate at either KCJ or TCI.

9.    At the present time, Involuntary Plaintiff Alex M. Azar II, Secretary of the United States Department of Health and Human Services, has oversight responsibility for the Health Care Financing Administration, the agency responsible for administering the federal Medicare program; on information and belief, the Medicare program has paid health claims on behalf of Ms. Ruffin-Traylor for medical care and services rendered as a result of the injuries herein setforth; pursuant to 42 U.S.C §1395y(b)(2), Medicare is entitled to reimbursement for related paid claims if the Plaintiff recovers through settlement or judgment, as determined by 42 C.F.R. § 411.37; said Plaintiff asserts no claim against the United States, its agencies or employees.

3

10.     At the present time, Involuntary Plaintiff Wisconsin Department of Health Services (hereinafter "Wisconsin DHS") is a governmental agency, duly organized and existing under and by virtue of the laws of the State of Wisconsin, with offices located at 1 West Wilson Street, Room 651, Madison, WI 53707; on information and belief, the Wisconsin DHS has paid medical and related expenses on behalf of Ms. Ruffin-Traylor as a result of injuries she sustained as hereinafter set forth; the Wisconsin DHS may have a subrogation interest herein with respect to its payments pursuant to §49.89, Wis. Stat., subject, however, to all limitations on the exercise of that right imposed by federal and state law; by reason of such payments, the Wisconsin DHS is joined as an involuntary plaintiff herein pursuant to Wis. Stat. §§49.89 and 803.03.

11.     Defendant Kenosha County is a municipal entity in the State of Wisconsin with offices located at 1010 56th Street in the City and County of Kenosha, Wisconsin. Acting through the Kenosha County Sheriff's Department, Kenosha County is responsible for training, supervising, and disciplining jail employees; adopting, implementing, and enforcing jail policies and practices; and ensuring that jail conditions and the treatment of detainees complies with the United States Constitution and other federal, state, and local laws. Under Wis. Stat. § 895.46(1)(a), Kenosha County is required to pay or indemnify all judgments, including for compensatory and punitive damages, attorney's fees, and costs that may be awarded against its officials and employees.

12.     Defendant Correctional Officer CK #12004 is an unknown adult resident of the State of Wisconsin who, at all times material hereto, was employed by the Kenosha County Sheriff's Department as a correctional officer at the time Ms. Ruffin-Traylor was

4

booked into the KCJ on January 13, 2014. Correctional Officer CK #12004 was responsible for the safe, secure and humane treatment of all KCJ inmates, including Ms. Ruffin-Traylor. In that role, he/she was responsible for the health and welfare of those confined in the jail, including Ms. Ruffin-Traylor. He/she was acting under color of state law and within the scope of his/her employment at all times relevant.

13. Defendants Unknown Sheriff Supervisors and Unknown Correctional Officers are unknown adult residents of the State of Wisconsin who, at all times material hereto, were employed by the Kenosha County Sheriff's Department as Sheriff Supervisor and Correctional Officers at the KCJ and were responsible for the safe, secure, and humane treatment of all KCJ inmates, including Ms. Ruffin-Traylor. The Unknown Sheriff Supervisors and Unknown Correctional Officers were acting under color of state law and within the scope of their employment at all times relevant.

14. Defendant Advanced Correctional Healthcare, Inc. ("ACH") is a for-profit foreign corporation duly licensed to do business in the State of Wisconsin, with its principal place of business located at 3922 West Baring Trace in the City and County of Peoria, Illinois, and is in the business of providing health care in a correctional setting. ACH is considered a "person" for purposes of 42 U.S.C. § 1983 and acted under color of state law to provide medical care and services to detainees at the KCJ. ACH was responsible for adopting, implementing, and enforcing policies and practices pertaining to medical care for the KCJ. ACH also was responsible for ensuring that the care provided at the KCJ met minimum constitutional and other legal standards and requirements.

5

15. Defendant Karen Lind Butler, M.D. ("Dr. Butler") is, upon information and belief, an adult resident of the State of Georgia, currently residing in Swainsboro, Georgia, and is a physician licensed to practice medicine in the State of Wisconsin. At all times material hereto, Dr. Butler was employed by ACH to provide medical services to KCJ inmates, including Ms. Ruffin-Traylor. In that role, she was responsible for the health and welfare of those confined in the jail. She was acting under color of state law and within the scope of her employment at all times relevant.

16. Upon information and belief, Defendant Visiting Nurse Community Care, Inc. ("VNCC") is an affiliate of Defendant, Kenosha Visiting Nurse Association, Inc. ("KVNA"). VNCC and KVNA (collectively "VNCC/KVNA") are for-profit domestic corporations organized and existing pursuant to the laws of the State of Wisconsin with offices located at 600 52nd Street, Suite 300, in the City and County of Kenosha, Wisconsin, and are in the business of providing health care in a correctional setting. VNCC and KVNA are each considered a "person" for purposes of 42 U.S.C. § 1983 and acted under color of state law to provide medical care and services to detainees at the KCJ. VNCC and KVNA were responsible for adopting, implementing, and enforcing policies and practices pertaining to medical care for the KCJ. VNCC and KVNA also were responsible for ensuring that the care provided at the KCJ met minimum constitutional and other legal standards and requirements.

17. Defendant Autumn Mercer, R.N. ("Nurse Mercer") is an adult resident of the State of Wisconsin currently residing in Mount Pleasant, Wisconsin. Nurse Mercer is a licensed registered nurse and, at all times material hereto, was employed by VNCC/KVNA

6

to provide medical services to KCJ inmates, including Ms. Ruffin-Traylor. In that role, she was responsible for the health and welfare of those confined in the KCJ. She was acting under color of state law and within the scope of her employment at all times relevant.

18. Defendant Joann Medley, R.N. ("Nurse Medley") was an adult resident of the State of Wisconsin. Nurse Medley was a licensed registered nurse and, at all times material hereto, Nurse Medley was employed by VNCC/KVNA to provide medical services to KCJ inmates and supervise other VNCC/KVNA nursing staff at the KCJ, including Ms. Ruffin-Traylor. In that role, she was responsible for the health and welfare of those confined in the KCJ. She was acting under color of state law and within the scope of her employment at all times relevant. Upon information and belief, Nurse Medley may have died on December 23, 2017.

19. Defendants Unknown Employees of VNCC/KVNA are unknown adult residents of the State of Wisconsin who are licensed practical or registered nurses or advanced practice nurse prescribers/nurse practitioners and, at all times material hereto, were employed by VNCC/KVNA to provide medical services to KCJ inmates, including Ms. Ruffin-Traylor. In their respective roles, Unknown Employees of VNCC/KVNA were responsible for the health and welfare of those confined in the KCJ. They were acting under the color of state law and within the scope of their employment at all times relevant.

20. Defendant Kelly O'Brien, M.D. ("Dr. O'Brien") is an adult, who, upon information and belief, currently resides in Lakewood, Colorado, and at all times material hereto, was a physician licensed to practice medicine in the State of Wisconsin and employed by the Wisconsin Department of Corrections ("DOC") to provide medical services to TCI

7

inmates, including Ms. Ruffin-Traylor. In that role, she was responsible for the health and welfare of those confined at the TCI. She was acting under color of state law and within the scope of her employment at all times relevant.

21.     Defendant Mary Lemmenes, APNP ("NP Lemmenes") is an adult resident of the State of Wisconsin currently residing in Waupun, Wisconsin, and at all times material hereto, NP Lemmenes was an advanced practice nurse prescriber/nurse practitioner and employed by the Wisconsin DOC to provide medical services to TCI inmates, including Ms. Ruffin-Traylor. In that role, she was responsible for the health and welfare of those confined in the jail. She was acting under color of state law and within the scope of her employment at all times relevant.

## Factual Allegations

A. <u>Ms. Ruffin-Traylor's Injury</u>

22.     On December 14, 2013, Ms. Ruffin-Traylor suffered a displaced fracture of her left fibula and tibia, with fracture fragments and a widening of the medial ankle socket, along with a high ankle sprain of the deltoid ligament, a descriptive name for a group of four ligaments which stabilize the medial or inside of the ankle joint and prevents the foot from turning outward. The injury occurred when she was physically assaulted by her boyfriend, who pushed her down a flight of stairs.

23.     After her ankle fracture was diagnosed in an emergency room visit to All Saints Hospital in Racine, Wisconsin, on December 17, 2013, Ms. Ruffin-Traylor was referred to Dr. Nathan Sockrider, a doctor of podiatric medicine ("DPM") for further treatment.

8

24. Ms. Ruffin-Traylor first saw Dr. Sockrider on December 19, 2013. They discussed her treatment options, and based on Dr. Sockrider's assessment and recommendation, Ms. Ruffin-Traylor decided on open reduction internal fixation ("ORIF") surgery at All Saints Hospital to reduce, realign, and stabilize the multiple ankle bone fractures with a plate and screws. Dr. Sockrider prescribed a wheelchair for Ms. Ruffin-Traylor because she was having difficulty using crutches.

25. Two surgery dates scheduled for the latter half of December 2013 were postponed because Ms. Ruffin-Traylor tested positive for drugs. After the first surgery was cancelled on December 30, 2013, Ms. Ruffin-Traylor resided at a women's shelter and group home and had the use of her wheelchair.

26. On January 8, 2014, while at All Saints Hospital for the ORIF surgery, the Racine Police Department took Ms. Ruffin-Traylor into custody for outstanding warrants on probation and parole violations and held Ms. Ruffin-Traylor at the Racine County Jail until January 13, 2014. Her wheelchair was left at the hospital.

B. Kenosha County Jail Health Services in 2014

27. In 2014, the KCJ was the primary intake facility for all arrested persons within Kenosha County, as well as a holding area for Wisconsin DOC Probation and Parole detainees. The combined inmate population at the KCJ and Kenosha Correction and Detention Center ("KCDC") was approximately 800.

28. Upon information and belief, prior to January 2014, ACH entered into a contract with the Kenosha County Sheriff's Department to provide the female and male inmates at the KCJ and KCDC with health services.

9

29.     Dr. Butler was employed by ACH as the sole medical director to fulfill its contract with the Kenosha County Sheriff's Department. At all times material hereto, Dr. Butler was the designated health authority in the KCJ and KCDC, supervising all aspects of the delivery of healthcare services within both facilities, approving and implementing a patient's plan of care and providing health care services to all KCJ and KCDC female and male inmates, including Ms. Ruffin-Traylor.

30.     Upon information and belief, prior to January 2014, VNCC/KVNA entered into a contract with the Kenosha County Sheriff's Department to staff the KCJ and KCDC health services units which would administer medical treatment to all female and male inmates at both facilities, including Ms. Ruffin-Traylor.

31.     Upon information and belief, registered nurses, licensed practical nurses and a family nurse practitioner were employed by VNCC/KVNA to fulfill its contract with the Kenosha County Sheriff's Department and provide daily health care services to KCJ and KCDC inmates, including Ms. Ruffin-Traylor.

32.     By reason of the contracts between the Kenosha County Sheriff's Department and ACH and VNCC/KVNA, the employees of ACH and VNCC/KVNA, including, but not limited to, Dr. Butler, Nurse Mercer, Nurse Medley and other Unknown Employees of VNCC/KVNA, were responsible for the safe, secure, and humane treatment of all KCJ inmates, including Ms. Ruffin-Traylor, and were required to act pursuant to Kenosha County Sheriff's Department policies, customs, and practices.

33.    In May 2014, the KCJ was staffed and equipped to house inmates with special medical conditions, including physical disabilities, and the Kenosha County Sheriff's Department was aware of the need to provide necessary medical treatment for inmates.

## C.  Arrestee Intake Health Screening

34.    The Kenosha County Sheriff's Department, at all times material to this action, had in effect policies and procedures for its correctional officers and health services staff to follow when dealing with arrestees and inmates at the KCJ who had special medical conditions.

35.    Pursuant to Policy #353.1, "Intake Medical Screening," a correctional officer was required to conduct an initial medical screening of all KCJ arrestees to ensure that the arrestee received appropriate and prompt medical attention, particularly when the required medical care and treatment was beyond the scope of the in-house KCJ medical staff.

36.    Pursuant to Policy #353.1 and Policy #353.4, a broken bone is a specific example of a serious or obvious injury: "Inmates [were to] be transported to the emergency room of Kenosha Memorial or St. Catherine's Hospital only in situations where it is evident that immediate attention is needed or loss of life will result. Such as: … **broken bones**."

37.    Notwithstanding the correctional officer's medical screening, pursuant to the policies, a nurse was required to make an independent medical screening of all arrestees at the booking stage to determine whether an arrestee's acceptance into the KCJ was medically appropriate.

38.    Pursuant to Policy #353.1, if an arrestee had an obvious injury, such as a broken bone, and both the correctional officer and nurse believed the arrestee's

11

incarceration should be deferred and the arrestee should be sent to an outside provider for immediate medically necessary treatment, the correctional officer must notify the arresting officer of the decision and instruct the arresting officer to transport the arrestee to a medical facility for appropriate care.

39. Pursuant to Policy #353.1 and #353.4, a Kenosha County Sheriff's Department supervisor was responsible for making the final decision about whether to defer an arrestee for medical care or proceed with incarceration at the KCJ.

40. Upon information and belief, it was Kenosha County Sheriff's Department practice in 2014 to prohibit KCJ inmates from having items, such as wheelchairs, walkers, or crutches, in O Block (isolation unit) cells. O Block inmates were not allowed to leave their cells. Food and medications were given to O Block inmates by sliding them on the floor through a small opening in the cell door.

41. At all times material to this action, female inmates with special medical conditions, especially inmates requiring assistive devices for mobility, were isolated in O Block cells for long periods of time due to the lack of available beds in the women's medical unit and the KCJ's lack of wheelchair accessible cells for women.

D. Delay in Treatment

42. On an order to detain from the Wisconsin DOC to the KCJ, Ms. Ruffin-Traylor was transferred from the Racine County Jail and booked into the KCJ on January 13, 2014.

12

43.     Ms. Ruffin-Traylor had a serious medical condition, pursuant to Policy #353.1 and Policy #353.4, *i.e.,* a fractured, unrepaired ankle, for which she was entitled to treatment when she entered the KCJ on January 13, 2014.

44.     As part of the booking process, Ms. Ruffin-Traylor was independently screened by both Correctional Officer CK #12004 and Nurse Mercer. Correctional Officer CK #12004 and Nurse Mercer noted in their booking entries that: (a) Ms. Ruffin-Traylor's ankle was broken, and (b) she had a rod in her right hip from prior joint replacement surgery.

45.     Despite having an obvious traumatic injury which, if left untreated, would result in serious physical injury and debilitation, neither Correctional Officer CK #12004 or Nurse Mercer decided it was medically necessary to defer Ms. Ruffin-Traylor's incarceration and send her to a hospital for surgery and follow-up medical care to treat and repair her fractured ankle.

46.     After completing her booking assessment of Ms. Ruffin-Traylor, Nurse Mercer emailed Unknown Sheriff Supervisor and Nurse Medley the status of Ms. Ruffin-Traylor's ankle, notifying them that her fracture had not yet been reduced. Nurse Medley recommended housing Ms. Ruffin-Traylor in the medical unit and permitting her the use of a wheelchair.

47.     The Unknown Sheriff Supervisor, after receiving Nurse Medley's email about Ms. Ruffin-Traylor's fractured and unrepaired ankle, did not defer Ms. Ruffin-Traylor's incarceration into the KCJ.

48.     In a January 14, 2014 telephone call with a nurse, Dr. Butler, who was not physically present at the KCJ and did not examine Ms. Ruffin-Traylor or review any medical records, was informed of her recently fractured and unrepaired ankle. Dr. Butler ordered crutches to assist Ms. Ruffin-Traylor's mobility and a wheelchair for long distances only.

49.     Due to a lack of available beds in the women's medical unit and no handicapped-equipped cells for female inmates, for the first three days of her incarceration Ms. Ruffin-Traylor was housed in O Block, the KCJ isolation unit for female inmates.

50.     Despite Dr. Butler's orders for crutches, Unknown Correctional Officers in O Block, following KCJ policies and procedures, denied Ms. Ruffin-Traylor crutches or a wheelchair. Ms. Ruffin-Traylor could not stand or walk in her O Block cell due to her broken ankle and did not have any assistive device to keep weight off the fractured ankle.

51.     From January 14 to January 16, 2014, Ms. Ruffin-Traylor crawled to her cell door to get meals and medications, and when going to the toilet and sink.

52.     At the time of her incarceration at the KCJ, Ms. Ruffin-Traylor was nearly 50 years old, weighed approximately 300 pounds and had an artificial right hip. Even with crutches, Ms. Ruffin-Traylor could not walk without her left foot on the ground and thereby continued to put significant weight on her fractured ankle. She could not perform activities of daily living ("ADLs"), such as eating, bathing, dressing, toileting, walking, making her bed and standing for roll call, without bearing weight on her ankle.

53.     Dr. Butler reviewed Ms. Ruffin-Traylor's medical records from Dr. Sockrider on or about January 18, 2014, and, without examining her, ordered an appointment with Dr. Sockrider.

54.     Unknown Correctional Officers in P Block, based on emails from nurses and telephone directives from Dr. Butler, who still had not seen Ms. Ruffin-Traylor, ignored her fractured ankle, her inability to bear any weight, and her difficulty using crutches. Instead, the Correctional Officers in P Block enforced KCJ policies and made Ms. Ruffin-Traylor do her regularly assigned chores and ADLs, requiring significant weight bearing on her broken ankle.

55.     On January 31, 2014, Ms. Ruffin-Traylor was evaluated by Dr. Sockrider. Between January 22 and 31, 2014, Ms. Ruffin-Traylor submitted at least four Inmate Medical Request Forms notifying the correctional officers and medical staff that her leg was swollen and painful, and informing them that she was unable to use her crutches without bearing weight on her ankle and requesting assistance.

56.     KCJ Correctional Officers referred Ms. Ruffin-Traylor's Medical Request Forms to health services, and Unknown Employees of VNCC/KVNA responded to each such request by repeating Dr. Butler's orders to continue using the crutches to keep the weight off her ankle.

57.     There were no orders issued by Dr. Butler, any nurse, sheriff supervisor, or correctional officer letting other inmates assist Ms. Ruffin-Traylor with her ADLs, as permitted by KCJ policy, even though they saw that she could not keep her foot off the ground, putting weight on her fractured ankle.

58.     On January 28, 2014, 10 days after Dr. Butler's order, an Unknown Employee of VNCC/KVNA made an appointment for Dr. Sockrider to examine Ms. Ruffin-Traylor.

Case 2:19-cv-01521-JPS   Filed 10/16/19   Page 15 of 43   Document 1

59.     When Dr. Sockrider examined Ms. Ruffin-Traylor on January 31, 2014, he noted material changes in her ankle since his last exam on January 8, 2014: an increase in angular deformity of the fracture fragments and a valgus deformity of the ankle.

60.     Ms. Ruffin-Traylor returned to the KCJ with orders from Dr. Sockrider that she remain non-weight bearing on her ankle, using a wheelchair or walker.

61.     Ms. Ruffin-Traylor filed another Inmate Medical Request Form on the evening of January 31, 2014, asking for the wheelchair or walker ordered by Dr. Sockrider so that she could comply with his non-weight bearing order.

62.     Unknown Correctional Officers referred Ms. Ruffin-Traylor's request to KCJ health services without taking any other action to provide her with a wheelchair or walker.

63.     After reviewing Dr. Sockrider's January 31, 2014 orders, Dr. Butler did not approve Dr. Sockrider's order for a wheelchair or walker. Dr. Butler renewed her order for crutches and for a wheelchair only for long distances.

64.     On February 4, 2014, 22 days after Ms. Ruffin-Traylor was booked in the KCJ and after ignoring Dr. Sockrider's order to remain non-weight bearing, Dr. Butler made her first visit to Ms. Ruffin-Traylor's cell and looked at her ankle from outside the cell door. Ms. Ruffin-Traylor told Dr. Butler about her inability to use the crutches to achieve total non-weight bearing on her leg and fractured ankle.

65.     Dr. Butler, knowing that Dr. Sockrider had ordered Ms. Ruffin-Traylor to remain completely non-weight bearing by using a wheelchair or walker and after seeing her, made the following progress note and order on February 4, 2014: "Pt says she wants wheelchair. She is in a cast now. She has no pain complaints. She says she cannot use the

16

crutches . . . We do need to keep her ambulatory. She is too sedentary. Will try crutches and wheelchair for distance."

66. Upon information and belief, Unknown Employees of VNCC/KVNA issued a walker to Ms. Ruffin-Traylor on February 4, 2014, despite Dr. Butler's progress note.

67. During a February 11, 2014 visit from Dr. Butler, Ms. Ruffin-Traylor complained to Dr. Butler that her ankle was painful and swollen because she was unable to use the walker without bearing weight on her ankle. Dr. Butler noted that she was using the walker and ordered the VNCC/KVNA nurses to check the swelling.

68. At 11:30 p.m. on February 11, 2014, a correctional officer took Ms. Ruffin-Traylor in a wheelchair to the health services unit. She complained to a VNCC/KVNA nurse about the constant pain and swelling in her left leg and also told the nurse that she was unable to keep weight off the leg as ordered by Dr. Sockrider. The Unknown Employee of VNCC/KVNA told Ms. Ruffin-Traylor she would contact Dr. Sockrider's office for "clarification" of his order for "no weight to left ankle."

69. After learning about Ms. Ruffin-Traylor's weight-bearing complaints, Nurse Medley emailed the on-duty Sheriff Supervisor and other Unknown VNCC/KVNA Employees recommending that she again be housed in O Block (the isolation unit) to "enhance her safety with mobility and to improve her ability to care for herself."

70. Unknown Correctional Officers moved Ms. Ruffin-Traylor to an O Block cell on February 12, 2014 and, upon information and belief, did not allow her to use her walker in the cell.

71.    Because she was not allowed to bear weight on her ankle but had nothing to assist her with mobility, for three days Ms. Ruffin-Traylor crawled to the O Block cell door to get her medications and meals and crawled across the cell to use the toilet and sink.

72.    On or about February 15, 2014, KCJ Correctional Officers moved Ms. Ruffin-Traylor back to P block housing, and the walker was returned to her.

73.    On February 25, 2014, Ms. Ruffin-Traylor explained to Dr. Sockrider the difficulties she was still having using a walker or crutches to keep weight off her leg. She returned to the KCJ with orders from Dr. Sockrider that she bear no weight on the ankle and that she be given a wheelchair.

74.    Dr. Butler did not order a wheelchair at that time.

75.    After reviewing Dr. Sockrider's February 25, 2014 orders, an Unknown Employee of VNCC/KVNA emailed the on-duty Sheriff Supervisor and Nurse Medley to notify them that Ms. Ruffin-Traylor was not allowed to bear weight on her leg and should be given the use of a wheelchair "as needed."

76.    Because Ms. Ruffin-Traylor did not receive a wheelchair as ordered by Dr. Sockrider, she contacted Disability Rights Wisconsin ("DRW"), a non-profit organization that protects the rights of people with disabilities. DRW filed a complaint with the KCJ on Ms. Ruffin-Traylor's behalf.

77.    Ms. Ruffin-Traylor, sometime after February 25 and on or before March 18, 2014, received a wheelchair for her use in the KCJ.

78.    X-rays taken of Ms. Ruffin-Traylor's ankle during her March 18, 2014 appointment with Dr. Sockrider showed a "new apparent anterior dislocation" of the ankle

18

joint with stable but severe widening of the ankle socket. Dr. Sockrider ordered an appointment with Dr. Krause, an orthopedic surgeon at All Saints Hospital, for surgical evaluation. In the meantime, Dr. Sockrider continued his order for no weight bearing on the ankle by using a wheelchair.

79. Dr. Krause examined Ms. Ruffin-Traylor's ankle on April 3, 2014, and took x-rays. He recommended ORIF surgery and sent an order to the KCJ to schedule surgery with Dr. Sockrider.

80. On April 4, 2014, after reviewing Dr. Krause's order for ORIF surgery, Nurse Medley sent the following email to the Wisconsin DOC and copied Kenosha County Sheriff's Department administrators at the KCJ: "We sent [Ms. Ruffin-Traylor] to the ER today to rule out a blood clot in her leg. This would likely be secondary to an old ankle fracture which has poorly healed. The reason I am writing is that her doctors are now considering a surgery involving breaking the site and placing various pins and plates in the ankle area. Such surgeries are complex, and the healing time is protracted and involves specialized care, at least initially. [Ms. Ruffin-Traylor] is not only obese, but she is non-compliant with suggested treatment plans, and has been since she was booked here. The long story shortened on her is that if the doctors order this surgery, housing her here won't be possible. She will need to be housed post-operatively in a nursing home. Can you check to see if there are any plans to release the [Probation & Parole] hold on this patient?"

81. On April 8, 2014, Nurse Medley asked another VNCC/KVNA nurse to call Dr. Sockrider's office and report that Ms. Ruffin-Traylor was wearing her boot but was

19

walking on her leg and to ask if she no longer needed a wheelchair or walker. Nurse Medley was told by Dr. Sockrider's staff that Ms. Ruffin-Traylor must remain non-weight bearing.

82.     On April 22, 2014, Dr. Sockrider gave the KCJ an order referring Ms. Ruffin-Traylor to Dr. William Yoder, a DPM in Kenosha, for ORIF surgery. Pending surgery, Dr. Sockrider continued his order for no weight bearing by using a wheelchair.

83.     On May 15, 2014, Dr. Yoder made his initial examination of Ms. Ruffin-Traylor. He noted the ankle joint fracture and "late-effect" dislocation with instability and deformity of the ankle. Surgery was scheduled for May 23, 2014—160 days after the injury and 131 days after Ms. Ruffin-Traylor entered the KCJ.

84.     Between January 13 and May 23, 2014, Ms. Ruffin-Traylor made several requests via Inmate Medical Request forms for medication to relieve the pain caused by weight bearing on her broken ankle.

85.     Between January 13 and May 23, 2014, Dr. Butler allowed Ms. Ruffin-Traylor's pain control medication to lapse on six occasions—a total of 55 out of the 131 days she was at the KCJ.

86.     Nurse Medley, Nurse Mercer, and Unknown Employees of VNCC/KVNA also allowed Plaintiff's pain control medication to lapse on those six occasions and delayed refilling Dr. Butler's orders for non-formulary medications from an outside pharmacy.

<u>ORIF Surgery and Rehabilitation at Clairidge House—<br>5/23/2014 to 8/30/2014</u>

87.     Due to the delay in surgery and the Defendants' actions and inactions that forced Ms. Ruffin-Traylor to bear weight on her broken ankle, the scheduled ORIF surgery

had a lower probability of success and increased the risk that the Ms. Ruffin-Traylor's ankle would be permanently deformed.

88.     On Friday, May 23, 2014, under general anesthesia at Kenosha Medical Center, Dr. Yoder performed ORIF surgery, stabilizing Ms. Ruffin-Traylor's outer ankle using a plate and 12 screws. Tendon transfer was part of the procedure to further stabilize the ankle joint.

89.     According to Dr. Yoder's May 23, 2014 operative note, Ms. Ruffin-Traylor's ankle had deteriorated markedly during her incarceration at the KCJ. Dr. Yoder found: "Chronic dislocation and malunion of distal fibular fracture with chronic dislocation of the left ankle with bimalleolar fracture present. Complete rupture of the [calcaneofibular] ligament along with complete rupture of deltoid ligament with chronic medial and lateral ankle instability, positive deltoid instability with positive talar tilt and anterior drawer present."

90.     A VNCC/KVNA nurse contacted Dr. Yoder's office on the morning of the surgery to find out his post-surgery plan for Ms. Ruffin-Traylor's care. Per Dr. Yoder's orders, Ms. Ruffin-Traylor was to be admitted post-surgery as an in-patient at the Hospital and would stay through the weekend. On Monday, May 27, 2014, Dr. Yoder planned to evaluate Ms. Ruffin-Traylor and formulate her future care plan.

91.     Post-surgery, Dr. Yoder wanted Ms. Ruffin-Traylor to be non-weight bearing for a substantial time to allow for healing of the ankle joint in proper alignment. Accordingly, Dr. Yoder ordered that she be sent to a rehabilitation facility for closely monitored post-surgery care and treatment.

21

92.     Dr. Butler spoke with Dr. Yoder and made this progress note on Monday, May 27, 2014: "Pt had her corrective surgery . . . He says he will do his best but due to the fact pt neglected the Fx for so long—damage too extensive. All relayed to pt. Have approved surgery & ortho will do what he can."

93.     Dr. Yoder recalls a telephone call with Dr. Butler but denies attributing the cause of the non-weight-bearing non-compliance to Ms. Ruffin-Traylor.

94.     Upon information and belief, following Ms. Ruffin-Traylor's surgery at Kenosha Medical Center, Dr. Yoder's order for post-surgery rehabilitation and treatment was not initially approved by either Dr. Butler, the VNCC/KVNA, or Kenosha County.

95.     Since a favorable surgical outcome for Ms. Ruffin-Traylor depended on closely monitored post-surgery rehabilitation, she again contacted DRW. With the help of a DRW legal advocate and Dr. Yoder, Ms. Ruffin-Traylor's transfer to a short-term rehabilitation facility, the Clairidge House in Kenosha, was eventually approved.

96.     On May 30, 2014, Dr. Yoder authorized Ms. Ruffin-Traylor's discharge from the Kenosha Medical Center, and she was transferred to the Clairidge House.

97.     Ms. Ruffin-Traylor received daily rehabilitation services and pain medication at the Clairidge House from May 30 through August 29, 2014.

98.     Ms. Ruffin-Traylor, per Dr. Yoder's orders, remained totally non-weight bearing between May 30 and July 31, 2014, first with a below-the-knee cast and use of a wheelchair and eventually with a pneumatic "CAM" (controlled action motion) boot and wheelchair.

22

99.     Between August 1 and 30, 2014, Ms. Ruffin-Traylor, still wearing a CAM boot, started very short duration, incremental weight bearing under the constant supervision of a Clairidge House physical therapist.

100.     Ms. Ruffin-Traylor was fully compliant with the rehabilitation at Clairidge House and made substantial progress.

101.     Nurse Mercer, Nurse Medley, and other Unknown Employees of VNCC/KVNA called the Clairidge House for progress reports on Ms. Ruffin-Traylor and to inquire whether she was ready to be discharged to the KCJ on 6/2/14, 6/7/14, 6/9/14, 6/13/14, 6/16/14, 6/23/14, 6/27/14, 6/30/14, 7/4/14, 7/7/14, 7/11/14, 7/14/14, 7/18/14, 7/21/14, 7/25/14, 7/28/14, 8/1/14, 8/4/14, 8/8/14, 8/15/14, and 8/18/14.

102.     On August 20, 2014, after learning from Clairidge House that Dr. Yoder had not issued discharge orders, a VNCC/KVNA nurse called Dr. Yoder's office to discuss his discharge plans for Ms. Ruffin-Traylor. Dr. Yoder was in surgery, and his nurse promised to fax orders about when Ms. Ruffin-Traylor would be medically cleared to return to the KCJ after Dr. Yoder's scheduled August 21, 2014 appointment with her.

103.     After his August 21, 2014 examination of Ms. Ruffin-Traylor, Dr. Yoder ordered continued rehabilitation services at the Clairidge House and scheduled a follow-up exam with her in three weeks. He faxed the following note to the KCJ on August 22, 2014: "[Ms. Ruffin-Traylor] underwent a major reconstructive procedure of her left ankle in May of 2014 for a neglected left ankle fracture. The patient has made progress to date but is still unable to bear full weight of the left extremity on a consistent basis. At this point she is a high fall risk and runs an even higher risk of suffering further damage to the reconstruction

23

of her left ankle without further close monitored care at a skilled nursing facility. I feel that if she would be transferred to a correctional facility she may lose all forward progress and will become a risk with her current limited weight bearing status. I ask that you please reconsider transferring her out of the skilled nursing facility at this time."

104.    Dr. Yoder received no response from Dr. Butler, Nurse Medley or any other VNCC/KVNA nurse.

105.    Seven days later, on August 29, 2014, ignoring Dr. Yoder's August 22, 2014 order requesting additional rehabilitation at Clairidge House, KCJ correctional officers brought Ms. Ruffin-Traylor back to the KCJ.

E.    Continued Disregard of Non-Weight-Bearing Orders and Delay in Treatment at KCJ

106.    Upon Ms. Ruffin-Traylor's return to the KCJ on August 29, 2014, an Unknown Employee of VNCC/KVNA authorized her to have a walker and wheelchair for long distances.

107.    Two weeks after Ms. Ruffin-Traylor's re-incarceration, Dr. Yoder examined her on September 12, 2014, noting that she was partial weight-bearing at the KCJ and was using a CAM boot, but that the weight-bearing was not being done progressively and under therapist supervision and guidelines. X-rays showed surgical fixation of the ankle, overall alignment of the joint, but a slight widening of the medial clear space.

108.    Ms. Ruffin-Traylor returned from her appointment with orders from Dr. Yoder to progress with weight-bearing from the CAM boot to a new lace-up boot, but to have an interim custom-fitted ankle foot orthosis ("AFO") brace (a type of ankle brace that controls the position and motion of the ankle, compensates for weakness and corrects

24

deformities). Dr. Yoder ordered other accommodations consistent with his post-surgery progressive, gradual weight-bearing plan of care.

109.    An Unknown Employee of VNCC/KVNA examined Ms. Ruffin-Traylor on September 15, 2014. Ms. Ruffin-Traylor reported pain in her ankle and requested a sturdier walker, as well as the AFO brace ordered by Dr. Yoder. The Unknown Employee of VNCC/KVNA called Dr. Yoder's office for clarification of his orders and emailed the on-duty Sheriff Supervisor, Nurse Medley and other VNCC/KVNA nurses requesting a new walker.

110.    On September 16, 2014, Dr. Yoder's office faxed to the KCJ a prescription for the custom-fitted AFO brace to be used by Ms. Ruffin-Traylor with continued progressive weight bearing still using the walker.

111.    On September 16, 2014, Dr. Yoder prescribed physical therapy for Ms. Ruffin-Traylor two to three times per week for four to six weeks (a total of eight to 18 physical therapy sessions). Dr. Butler approved that order on September 19, 2014. Ms. Ruffin-Traylor was evaluated for physical therapy on September 23, 2014.

112.    In the three weeks that Ms. Ruffin-Traylor remained incarcerated at the KCJ, she received only 5 of the eight to 18 physical therapy sessions prescribed by Dr. Yoder and approved by Dr. Butler.

113.    On October 2, 2014, Dr. Yoder examined Ms. Ruffin-Traylor and learned that she had not been fitted for the AFO brace. Dr. Yoder called the KCJ about the delay and was told by a VNCC/KVNA nurse that her fitting was scheduled for October 3, 2014.

114.    Ms. Ruffin-Traylor received the custom-fitted AFO brace on October 16, 2014—31 days after it was ordered by Dr. Yoder.

115.    Dr. Yoder planned to have Ms. Ruffin-Traylor transition to a more supportive AFO brace but was not advised by any KCJ or VNCC/KVNA employees of the timing of her transfer to TCI.

116.    Throughout the course of Ms. Ruffin-Traylor's incarceration at the KCJ and as detailed above, Kenosha County decision makers acquiesced in a widespread practice in which inmates were denied necessary but costly medical care, treatment, or services, in part because of the expense associated with care. This practice resulted in significant delays with respect to Ms. Ruffin-Traylor's care, treatment, and services.

117.    Ms. Ruffin-Traylor was transferred from the KCJ to TCI on October 17, 2014.

F.    Continued Disregard of Non-Weight-Bearing Orders and Delay in Treatment at TCI

118.    KCJ's Health Transfer Summary apprised TCI of the condition of Ms. Ruffin-Traylor's ankle, and her need for an ankle brace and walker and a wheelchair for long distances.

119.    At an October 31, 2014 physical therapy evaluation, a TCI physical therapist and NP Lemmenes determined that any further physical therapy would not eliminate the ankle pain caused by her gross ankle valgus and discontinued it.

120.    A TCI doctor referred Ms. Ruffin-Traylor for follow-up with an off-site podiatrist on November 4, 2014, and on January 6, 2015, NP Lemmenes prepared the off-

site service request and report referring her to the Fond du Lac Family Foot Clinic for an evaluation of her ankle.

121. On January 6, 2015—62 days after the referral for outside treatment—Ms. Ruffin-Traylor was seen by Dr. Jonathan Stroebel, DPM, to evaluate her various braces and recommend a plan of care. Dr. Stroebel found that: "As a result of the severity of the injury and the delay of onset of care [Ms. Ruffin-Traylor had] developed long-term sequellae [sic] including ankle instability with likely complete failure of the deltoid ligament and the posterior tibial tendon as well as a significant talar tilt and degenerative changes in the ankle joint."

122. X-rays of the ankle on January 6, 2015, showed further degenerative joint deterioration, as predicted by Dr. Yoder in his August 22, 2014 fax to the KCJ.

123. In consultation with Dr. Alyssa Stephenson, DPM, on January 6, 2105, Dr. Stroebel prescribed a more rigid brace, as planned by Dr. Yoder, to stabilize the ankle prior to further surgical intervention. Dr. O'Brien and NP Lemmenes reviewed Dr. Stroebel's orders for the brace.

124. A month later, NP Lemmenes prepared another off-site service request and report, and Ms. Ruffin-Traylor saw a certified orthotist for the brace. On February 5, 2015, she was fitted for a new, rigid custom AFO brace and rocker-bottom shoes to compensate for the lost range of motion in her ankle joint and to make walking less painful.

125. Ms. Ruffin-Traylor received the custom fitted AFO brace on April 3, 2015 and the shoes on May 18, 2015—87 and 132 days, respectively, after Dr. Stroebel's prescription.

126.    All total, Ms. Ruffin-Traylor continued to weight bear on her fractured ankle after incarceration at TCI, waiting 168 days to get fitted with the rigid AFO brace needed to provide support. The delay in receiving the brace exacerbated the condition of her ankle and caused further deterioration and pain.

127.    On April 21, 2015, NP Lemmenes ordered a PT evaluation to determine if a seated-walker was medically indicated for Ms. Ruffin-Traylor. She was evaluated on May 8, 2015 and received a four-wheeled walker with seat on May 12, 2015, 21 days after the evaluation was ordered.

128.    On August 21, 2015, Ms. Ruffin-Traylor, in constant pain, asked NP Lemmenes if she could see Dr. Stroebel for a new plan of care involving further surgery. NP Lemmenes advised Ms. Ruffin-Traylor that due to her scheduled release from TCI in five months (December 2015) there would "not be enough time for surgery [and] rehabilitation" after the extensive reconstruction of ankle that would be needed. Ms. Ruffin-Traylor insisted on seeing Dr. Stroebel, but no appointment was made.

129.    NP Lemmenes next saw Ms. Ruffin-Traylor two months later on October 6, 2015. Ms. Ruffin-Traylor again requested a referral to discuss surgery with her outside podiatrist. NP Lemmenes told her that her surgical options were limited due to her upcoming release in December 2015.

130.    Dr. Stephenson examined Ms. Ruffin-Traylor on October 26, 2015. Dr. Stephenson found that her extreme pain was being caused by her valgus-positioned ankle but did not schedule surgery because Dr. Stephenson's surgery schedule was not open until late November 2015.

131.    All of Ms. Ruffin-Traylor's delayed care and ineffective treatment between October 17, 2014 and December 22, 2015, including NP Lemmenes', Dr. Stroebel's and Dr. Stephenson's treatment and orders, were reviewed by Dr. O'Brien, who took no action to expedite Ms. Ruffin-Traylor's treatment despite the continued deterioration in the ankle.

132.    Ms. Ruffin-Traylor was released from TCI on December 22, 2015.

133.    Due to the Defendants' actions and inactions, including prohibiting Ms. Ruffin-Traylor from following her doctors' orders and directives, significant, unreasonable, and unnecessary delays in care and treatment, medically inappropriate supervision, and forcing Ms. Ruffin-Traylor to bear weight on her broken ankle, at the time of her release from TCI, Ms. Ruffin-Traylor's ankle had deteriorated to the point that the best medical option for long term pain relief and maximum mobility was to amputate her leg below the knee.

134.    Afraid of permanently losing her leg, Ms. Ruffin-Traylor dealt with severe pain, discomfort, and limited mobility until she could no longer bear to do so. Her leg was amputated below the knee in 2019.

**Claims for Relief**

Count 1 – Federal Constitutional Claims Against Dr. Butler and Advanced
Correctional Health Care, Inc.

135.    Incorporate by reference all preceding paragraphs.

136.    Dr. Butler knew about Ms. Ruffin-Traylor's fractured, unrepaired ankle and that her broken bones and damaged ligaments could not sufficiently stabilize her ankle to support the muscles of her lower leg and the weight of Ms. Ruffin-Traylor's body.

29

137. Dr. Butler knew that Ms. Ruffin-Traylor needed medical treatment outside the KCJ to properly repair her ankle and that such treatment would offer her relief.

138. Dr. Butler knew that Ms. Ruffin-Traylor's treating podiatrist consistently ordered that she bear no weight on her broken ankle.

139. Dr. Butler knew that Ms. Ruffin-Traylor needed a wheelchair to completely comply with her treating doctor's non-weight bearing orders and that such accommodations and medical treatment would offer her relief.

140. Dr. Butler knew that weight bearing on a fractured ankle would exacerbate the condition and put Ms. Ruffin-Traylor at significant risk to develop increased pain, swelling, longer healing time, stiffness, degenerative arthritis and permanent deformities.

141. Instead of providing Ms. Ruffin-Traylor with effective medical treatment and ensuring that she was non-weight bearing between January and May 2014, as consistently ordered by Ms. Ruffin-Traylor's outside treaters, Dr. Butler wrote orders to "keep [Ms. Ruffin-Traylor] ambulatory," provided ineffective treatment, delayed outside medical treatment and consultations with a specialist, blamed Ms. Ruffin-Traylor for causing the deterioration in her ankle and otherwise departed from accepted medical judgment, practice, and standards.

142. After Ms. Ruffin-Traylor's ORIF surgery, Dr. Butler knew from orders and other communications with Dr. Yoder that she needed proper post-surgery care at a skilled rehabilitation facility and that only such carefully monitored rehabilitative treatment would give Plaintiff a reasonable chance for a favorable surgical outcome.

143.     Dr. Butler knew that returning Ms. Ruffin-Traylor to the KCJ before she could independently perform her ADLs and failing to follow the weight bearing limitations prescribed by her treating doctor would exacerbate her condition and put Ms. Ruffin-Traylor at significant risk of compromising the surgical reconstruction of her ankle.

144.     Within days after Ms. Ruffin-Traylor's return to the KCJ after her reconstruction surgery, Dr. Butler knew that the correctional officers and Unknown Employees of VNCC/KVNA had Ms. Ruffin-Traylor ambulating and doing her ADLs without any assistive device, causing her to bear substantial weight on her ankle.

145.     Dr. Butler knowingly ignored Dr. Yoder's order for progressive, closely monitored weight bearing and otherwise departed from accepted post-surgical medical judgment, practice, and standards between August 30 and October 17, 2014.

146.     Dr. Butler's failure to prescribe continuous medication for Ms. Ruffin-Traylor caused her to unnecessarily endure significant pain.

147.     Dr. Butler's treatment of Ms. Ruffin-Traylor and disregard of the substantial risks to her health resulted in an exacerbation of Ms. Ruffin-Traylor's condition, caused a complicated ORIF surgery, impeded and prevented the proper post-surgery healing of her ankle, ultimately resulting in amputation of her left leg below the knee, and subjected her to significant pain and suffering.

148.     Dr. Butler's medical judgment failed to follow KCJ policies and procedures. Instead, Dr. Butler chose an easier, cheaper, and less efficacious course of treatment for Ms. Ruffin-Traylor which was a significant departure from minimally competent medical

31

judgment and was so substantially outside the standard of care because she knew and disregarded the risks to Ms. Ruffin-Traylor.

149. Dr. Butler's refusal to follow outside doctor's non-weight bearing orders and her delay in getting Ms. Ruffin-Traylor effective medical treatment served no penological interest.

150. Dr. Butler's decisions and delays in treating Ms. Ruffin-Traylor were intentionally made based on cost considerations and for financial reasons in complete disregard for her medical needs.

151. Dr. Butler's acts and omissions constitute deliberate indifference under the Eighth and Fourteenth Amendments to the U.S. Constitution.

152. At all times material hereto, Dr. Butler acted under color of state law and in the scope of her employment to deprive Ms. Ruffin-Traylor of her constitutionally protected rights, including, but not limited to, the right to be free of cruel and unusual punishment, guaranteed by the Eighth and Fourteenth Amendments to the U.S. Constitution.

153. Dr. Butler's violation of Ms. Ruffin-Traylor's constitutional rights has resulted in the unnecessary and wanton infliction of physical pain and suffering and emotional distress, and Ms. Ruffin-Traylor will continue to experience further loss of function and unnecessary pain and suffering and emotional distress in the future.

154. The violations of Ms. Ruffin-Traylor's constitutional rights under the Eighth and Fourteenth Amendments to the Constitution and Ms. Ruffin-Traylor's damages were directly caused by the actions and/or inactions of Dr. Butler, acting within the scope of her employment at Advanced Correctional Health Care, Inc.

32

155.    Incorporate by reference all preceding paragraphs.

156.    Nurse Mercer, Nurse Medley, and other Unknown Employees of VNCC/KVNA (the "VNCC/KVNA Staff") knew that Ms. Ruffin-Traylor's ankle was fractured and not surgically repaired at the time she was booked into the KCJ and that Ms. Ruffin-Traylor's fractured ankle and damaged ligaments could not stabilize her ankle to support the muscles of her lower leg and the weight of her body.

157.    Nurse Mercer, Nurse Medley, and the Unknown Employees of VNCC/KVNA knew that Ms. Ruffin-Traylor needed immediate outside medical treatment to repair her fractured ankle and that such treatment would offer her relief.

158.    Nurse Mercer, Nurse Medley, and the Unknown Employees of VNCC/KVNA knew that Ms. Ruffin-Traylor's treating podiatrist consistently ordered that she bear no weight on her broken ankle.

159.    Nurse Mercer, Nurse Medley, and the Unknown Employees of VNCC/KVNA knew that Ms. Ruffin-Traylor needed a wheelchair to completely comply with her treating doctor's non-weight bearing orders and continuous pain control medication and that such accommodations and medical treatment would offer Ms. Ruffin-Traylor relief.

160.    Nurse Medley's knowing transfer of Ms. Ruffin-Traylor to O Block isolation for three days after she complained about being reprimanded by Dr. Sockrider for weight-bearing on her ankle was done in retaliation to punish Ms. Ruffin-Traylor for complaining and not to "enhance her safety" or "improve [Plaintiff's] ability to care for herself."

33

161. Nurse Mercer, Nurse Medley, and the Unknown Employees of VNCC/KVNA knew that weight bearing on a fractured ankle would exacerbate the condition and put Ms. Ruffin-Traylor at significant risk to develop increased pain, swelling, longer healing time, stiffness, degenerative arthritis, and permanent deformities.

162. Instead of providing Ms. Ruffin-Traylor with effective medical treatment and ensuring that she was non-weight bearing between January and May 2014, Nurse Mercer, Nurse Medley, and the Unknown Employees of VNCC/KVNA forced Ms. Ruffin-Traylor to bear weight on her ankle, repeated ineffective treatment, delayed outside medical treatment and consultations with a specialist, blamed Ms. Ruffin-Traylor for causing the deterioration in her ankle and otherwise departed from accepted medical judgment, practice, and standards.

163. Nurse Medley knew that the ORIF surgery recommended by Ms. Ruffin-Traylor's treating doctor was costly and attempted to evade incurring the cost of the surgery and post-surgery rehabilitation by inquiring of the Wisconsin DOC whether Ms. Ruffin-Traylor's release from the KCJ was imminent.

164. After Ms. Ruffin-Traylor's ORIF surgery, Nurse Mercer, Nurse Medley, and the Unknown Employees of VNCC/KVNA knew, based on orders from Dr. Yoder, that Ms. Ruffin-Traylor needed proper post-surgery care at a skilled rehabilitation facility and that only such carefully monitored rehabilitative treatment would give Ms. Ruffin-Traylor a reasonable chance for a favorable surgical outcome.

165. Nurse Mercer, Nurse Medley, and the Unknown Employees of VNCC/KVNA knew that returning to the KCJ before Ms. Ruffin-Traylor could

independently perform her ADLs and failing to follow the weight-bearing limitations prescribed by her treating doctor would exacerbate her condition and put Ms. Ruffin-Traylor at significant risk of compromising the surgical reconstruction of her ankle. Despite that knowledge, Nurse Mercer, Nurse Medley, and other Unknown Employees of VNCC/KVNA, between June 2, 2014, and August 18, 2014, called Clairidge House at least 21 times pushing for Ms. Ruffin-Traylor's discharge and return to the KCJ.

166.    After Ms. Ruffin-Traylor's post-surgery return to the KCJ after her reconstruction surgery, Nurse Mercer, Nurse Medley, and the Unknown Employees of VNCC/KVNA knowingly ignored Dr. Yoder's order for gradually progressive, closely monitored weight bearing and otherwise departed from accepted post-surgical medical judgment, practice, and standards between August 30 and October 17, 2014.

167.    Nurse Mercer, Nurse Medley, and the Unknown Employees of VNCC/KVNA's knowing failure to provide Ms. Ruffin-Traylor with adequate, on-going pain control medication caused her to unnecessarily endure significant pain.

168.    Nurse Mercer, Nurse Medley, and the Unknown Employees of VNCC/KVNA's treatment of Ruffin-Traylor and disregard of the substantial risks to Ms. Ruffin-Traylor's health resulted in an exacerbation of Ms. Ruffin-Traylor's condition, caused a complicated ORIF surgery, impeded the proper post-surgery healing of her ankle, ultimately resulting in amputation of her left leg below the knee, and subjected her to loss of function and significant pain and suffering.

169.    Nurse Mercer, Nurse Medley, and the Unknown Employees of VNCC/KVNA's medical judgment failed to follow KCJ policies and procedures. Instead,

the Unknown Employees of VNCC/KVN, Nurse Medley, and Nurse Mercer chose an easier, cheaper, and less efficacious course of treatment for Ms. Ruffin-Traylor which was a significant departure from minimally competent medical judgment and was so substantially outside the standard of care because they knew and disregarded the risks to the Ms. Ruffin-Traylor.

170.    Nurses Mercer, Nurse Medley, and the Unknown Employees of VNCC/KVNA's refusal to follow outside doctor's non-weight bearing orders and their delay in getting Ms. Ruffin-Traylor effective medical treatment served no penological interest.

171.    Nurse Mercer, Nurse Medley, and the Unknown Employees of VNCC/KVNA's decisions and delays in treatment were intentionally made based on cost considerations and for financial reasons in complete disregard for Ms. Ruffin-Traylor's medical needs.

172.    Nurse Mercer, Nurse Medley, and the Unknown Employees of VNCC/KVNA's obdurate and wanton acts and omissions constitute deliberate indifference under the Eighth and Fourteenth Amendments to the U.S. Constitution.

173.    At all times material hereto, Nurse Mercer, Nurse Medley, and the Unknown Employees of VNCC/KVNA acted under color of state law to deprive Ms. Ruffin-Traylor of her constitutionally protected rights, including, but not limited to, the right to be free of cruel and unusual punishment, guaranteed by the Eighth and Fourteenth Amendments to the U.S. Constitution.

174. Nurse Mercer, Nurse Medley, and the Unknown Employees of VNCC/KVNA's violation of Ms. Ruffin-Traylor's constitutional rights has resulted in unnecessary and wanton infliction of physical pain and suffering and emotional distress, and Ms. Ruffin-Traylor will continue to experience further loss of function and unnecessary pain and suffering and emotional distress in the future.

175. The violations of Ms. Ruffin-Traylor's constitutional rights under the Eighth and Fourteenth Amendments to the Constitution and Ms. Ruffin-Traylor's damages were directly caused by the actions and/or inactions of Nurse Mercer, Nurse Medley, and Unknown Employees of VNCC/KVNA, acting within the scope of their employment at VNCC/KVNA.

<u>Count 3 – Federal Constitutional Claims Against Correctional Officer #12004, Other Unknown Kenosha County Sheriff's Supervisors, Correctional Officers and Kenosha County</u>

176. Incorporate by reference all preceding paragraphs.

177. Correctional Officer #12004 and other Unknown Kenosha County Sheriff Supervisors and Correctional Officers (collectively the "KCJ Correctional Staff") knew that Ms. Ruffin-Traylor's ankle was fractured and not surgically repaired at the time she was booked and that a broken bone, KCJ policies and procedures, was a serious medical condition for which Ms. Ruffin-Traylor's incarceration could be deferred pending treatment.

178. KCJ Correctional Staff knew that Ms. Ruffin-Traylor needed immediate medical treatment which could not be performed by KCJ health services to repair her fractured ankle and knew that such treatment would offer her relief.

179. KCJ Correctional Staff knew that Ms. Ruffin-Traylor's treating podiatrist consistently ordered that she bear no weight on her broken ankle.

180. KCJ Correctional Staff knew that Ms. Ruffin-Traylor needed a wheelchair to comply with her treating doctor's non-weight bearing orders and pain medication and that such accommodations and medical treatment would offer her relief.

181. KCJ Correctional Staff knew that weight bearing on a fractured ankle would exacerbate the condition.

182. Instead of providing Ms. Ruffin-Traylor with meaningful accommodations for her fractured ankle between January and May 2014, KCJ Correctional Staff forced her to bear weight on her ankle and required her to perform chores and ADLs without assistive devices.

183. After Ms. Ruffin-Traylor's return to the KCJ after her reconstruction surgery, KCJ Correctional Staff knowingly ignored doctor's orders for progressive weight bearing between August 30 and October 17, 2014.

184. KCJ Correctional Staff's knowing disregard of Ms. Ruffin-Traylor's fractured ankle put her health and safety at excessive risk and resulted in an exacerbation of her condition, caused a complicated ORIF surgery, impeded the proper post-surgery healing of Ms. Ruffin-Traylor's ankle, ultimately resulting in amputation of the left leg below the knee, and subjected her to significant loss of function, pain, and suffering.

185. KCJ Correctional Staff's treatment of Ms. Ruffin-Traylor served no penological interest.

186. KCJ Correctional Staff's decisions to ignore Ms. Ruffin-Traylor's Inmate Medical Request Forms and complaints about the lack of effective medical care and treatment for her fractured ankle were intentionally made based on cost considerations and for financial reasons in complete disregard for Ms. Ruffin-Traylor's medical needs.

187. KCJ Correctional Staff's deliberate indifference to Ms. Ruffin-Traylor's serious medical condition constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution.

188. At all times material hereto, the KCJ Correctional Staff acted under color of state law to deprive Ms. Ruffin-Traylor of her constitutionally protected rights, including, but not limited to, the right to be free of cruel and unusual punishment, guaranteed by the Eighth and Fourteenth Amendments to the U.S. Constitution.

189. KCJ Correctional Staff's violation of Ms. Ruffin-Traylor's constitutional rights has resulted in unnecessary and wanton infliction of physical pain and suffering, and emotional distress, and Ms. Ruffin-Traylor will continue to experience further loss of function, unnecessary pain and suffering and emotional distress in the future.

190. Kenosha County decision makers acquiesced in a policy that resulted in the deprivation of constitutional rights of inmates, including the rights of Ms. Ruffin-Traylor to necessary health care services and treatment.

191. The violations of Ms. Ruffin-Traylor's constitutional rights under the Eighth and Fourteenth Amendments to the Constitution and Ms. Ruffin-Traylor's damages were directly caused by the actions and/or inactions of Correctional Officer #12004, Other

Unknown Kenosha County Sheriff's Supervisors and Correctional Officers, acting within the scope of their employment with Kenosha County, and Kenosha County.

<u>Count 4 – Federal Constitutional Claims Against Dr. O'Brien and NP Lemmenes</u>

192.  Incorporate by reference all preceding paragraphs.

193.  Dr. O'Brien and NP Lemmenes knew about Ms. Ruffin-Traylor's fractured ankle and May 2014 ORIF surgery.

194.  Dr. O'Brien and NP Lemmenes knew that Ms. Ruffin-Traylor's surgically repaired ankle could not support the muscles of her lower leg and the weight of her body.

195.  Dr. O'Brien and NP Lemmenes knew that Ms. Ruffin-Traylor's treating podiatrist ordered a custom-fit AFO brace and rocker-soled shoes and that the brace and shoes would offer Ms. Ruffin-Traylor relief.

196.  Dr. O'Brien and NP Lemmenes knew that Ms. Ruffin-Traylor required treatment from a specialist to treat her serious medical condition.

197.  Dr. O'Brien and NP Lemmenes knew that weight bearing on Ms. Ruffin-Traylor's ankle would exacerbate the condition and put her at significant risk to develop increased pain, swelling, stiffness, degenerative arthritis, and permanent damage deformities.

198.  Instead of providing Ms. Ruffin-Traylor with effective medical treatment for her ankle between October 17, 2014, and April 18, 2015, Dr. O'Brien and NP Lemmenes forced her to bear weight on her ankle, delayed medical treatment from her specialist, repeated ineffective treatment and otherwise departed from accepted medical judgment, practice, and standards.

199.    Dr. O'Brien's and NP Lemmenes' treatment of Ms. Ruffin-Traylor and disregard of the substantial risks to her health resulted in an exacerbation of Ms. Ruffin-Traylor's condition, impeded proper healing of her ankle, ultimately resulting in amputation of her left leg below the knee, and subjected her to significant pain and suffering.

200.    Dr. O'Brien's and NP Lemmenes' medical decisions were an easier, cheaper, and less efficacious course of treatment for Ms. Ruffin-Traylor and were a significant departure from minimally competent medical judgment and were so substantially outside the standard of care because they knew and disregarded the risks to her.

201.    Dr. O'Brien's and NP Lemmenes' refusal to follow outside doctor's orders and their delay in getting Ms. Ruffin-Traylor effective medical treatment served no penological interest.

202.    Dr. O'Brien's and NP Lemmenes' decisions and delays were intentionally made based on cost considerations and for financial reasons in complete disregard for Ms. Ruffin-Traylor's medical needs.

203.    Dr. O'Brien's and NP Lemmenes' acts and omissions constitute deliberate indifference under the Eighth and Fourteenth Amendments to the U.S. Constitution.

204.    At all times material hereto, Dr. O'Brien and NP Lemmenes acted under color of state law to deprive Ms. Ruffin-Traylor of her constitutionally protected rights, including, but not limited to, the right to be free of cruel and unusual punishment, guaranteed by the Eighth and Fourteenth Amendments to the U.S. Constitution.

205.    Dr. O'Brien's and NP Lemmenes' violation of Ms. Ruffin-Traylor's constitutional rights has resulted in unnecessary and wanton infliction of physical pain and

suffering, and emotional distress, and Ms. Ruffin-Traylor will continue to experience further loss of function, unnecessary pain and suffering and emotional distress in the future.

206. The violations of Ms. Ruffin-Traylor's constitutional rights under the Eighth and Fourteenth Amendments to the Constitution and Ms. Ruffin-Traylor's damages were directly caused by the actions and/or inactions of Dr. O'Brien and NP Lemmenes, acting within the scope of their employment with the Wisconsin DOC.

## Requested Relief

WHEREFORE, Plaintiff, Natalie Ruffin-Traylor, respectfully prays for judgment against the Defendants as follows:

A. An award of compensatory damages from Defendants in an amount to be determined at the trial of this matter;

B. Plaintiff's reasonable attorneys' fees, including litigation expenses and costs, pursuant to 42 U.S.C. §§ 12133 and 12205 and 42 U.S.C. § 1988(b);

C. An award of punitive damages for deliberate indifference; and

D. Such other and further relief as the Court deems just and proper.

## PLAINTIFF DEMANDS A JURY TRIAL.

Dated: October 16, 2019

s/ Michael J. Cerjak
Patrick O. Dunphy
State Bar No. 1016947
Michael J. Cerjak
State Bar No. 1056777
Rachel E. Potter
State Bar No. 1102790

CANNON & DUNPHY, S.C.
595 North Barker Road
P. O. Box 1750
Brookfield, WI 53008-1750
Phone:       (262) 796-3701
Fax:          (262) 796-3711
Email:       pdunphy@c-dlaw.com
             mcerjak@c-dlaw.com
             rpotter@c-dlaw.com

- and -

Mark A. Peterson
State Bar No. 1016259
PETERSON LAW AND MEDIATION, LLC
1433 North Water Street, Suite 400
Milwaukee, WI 53202
Phone: (414) 877-7312
Email: mark@markpetersonlaw.com