UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| NATALIE RUFFIN-TRAYLOR,<br><br>   Plaintiff,<br><br>and<br><br>ALEX M. AZAR II and ANDREA PALM,<br><br>   Involuntary Plaintiffs,<br><br>v.<br><br>KAREN LIND BUTLER, ADVANCED CORRECTIONAL HEALTHCARE, INC., AUTUMN MERCER, VISITING NURSE COMMUNITY CARE, INC., KENOSHA VISITING NURSE ASSOCIATION, KENOSHA COUNTY, KELLY O'BRIEN, MARY LEMMENES, JOANN MEDLEY, CORRECTIONAL OFFICER CK, UNKNOWN NURSE EMPLOYEES OF VNCC/KVNA, and UNKNOWN SHERIFF SUPERVISORS AND CORRECTIONAL OFFICERS OF THE KENOSHA COUNTY SHERIFF'S DEPARTMENT,<br><br>   Defendants. | Case No. 19-CV-1521-JPS<br><br>**ORDER** |

1. **INTRODUCTION**

  Natalie Ruffin-Traylor ("Plaintiff") was an inmate, first at Kenosha County Jail ("KCJ") then at Taycheeda Correctional Institution ("TCI"). On October 16, 2019, Plaintiff filed this complaint pursuant to 42 U.S.C. § 1983, alleging that the above-named defendants violated her Eighth and

Fourteenth Amendment rights. (Docket #1). Through their respective attorneys, Defendant Advanced Correctional Healthcare, Inc. ("ACH") and Defendants Visiting Nurse Community Care, Inc. and its affiliate Kenosha Visiting Nurse Association, Inc. (collectively, "VNCC") filed motions to dismiss. (Docket #10 and #39). For the reasons discussed herein, the Court will grant both motions.

2. **RELEVANT FACTS**[1]

   2.1 **Plaintiff's Injury**

On December 14, 2013, Plaintiff was physically assaulted by her boyfriend and sustained injuries to her left fibula and tibia, as well as her ankle and the surrounding ligaments. Post-diagnosis, Plaintiff met with Dr. Nathan Sockrider ("Dr. Sockrider"), a doctor of podiatric medicine. At Plaintiff's initial appointment with Dr. Sockrider, she decided to receive an open reduction internal fixation ("ORIF") surgery. Because Plaintiff was having difficulty using crutches, Dr. Sockrider prescribed her a wheelchair.

Plaintiff's first surgery date was rescheduled because she tested positive for drugs. Then, on January 8, 2014, while Plaintiff was at All Saints Hospital for her ORIF operation, the Racine Police Department took her into custody for outstanding warrants on probation and parole violations. Plaintiff remained at the Racine County Jail for five days without her wheelchair because it was left at the hospital.

   2.2 **General Healthcare Services at KCJ**

In accordance with an order to detain from the Wisconsin Department of Corrections ("DOC"), Plaintiff was transferred and booked into KCJ on January 13, 2014. During the relevant time period, KCJ did not

---

[1]The facts are taken from Plaintiff's complaint. (Docket #1).

Page 2 of 14
Case 2:19-cv-01521-JPS   Filed 09/02/20   Page 2 of 14   Document 64

directly provide healthcare services to its inmates. Instead, it had contracted with ACH, which in turn was responsible for adopting, implementing, and enforcing policies and practices pertaining to medical care at KCJ. ACH was also responsible for ensuring that the care it provided at KCJ met minimum constitutional and other legal standards and requirements. During the relevant time period, ACH employed Dr. Karen Butler ("Dr. Butler") as the sole medical director at KCJ. Thus, Dr. Butler was the designated health authority at KCJ and Kenosha County Detention Center. Dr. Butler supervised all aspects of the delivery of healthcare services at both facilities, approved and implemented patients' plans of care, and provided health care services to all inmates.

KCJ also had a contract with VNCC to staff its health services units and administer medical treatment to inmates. VNCC hired registered nurses, licensed practical nurses, and a family nurse practitioner to provide such services. Plaintiff alleges that, pursuant to the aforementioned contractual relationships, both ACH and VNCC employees were responsible for the safe, secure, and humane treatment of KCJ inmates and were required to act in accordance with Kenosha County Sheriff's Department policies, customs, and practices.

One such policy, Policy #353.1 "Intake Medical Screening," required a correctional officer and a nurse to conduct independent, initial medical screenings of all arrestees. If it was evident that an arrestee needed medical attention, staff should transfer him or her to the emergency room. Pursuant to KCJ policy, an arrestee's broken bone warranted deferral of incarceration and required further medical attention. Additionally, if both the nurse and the correctional officer determined that an arrestee's incarceration should be deferred, they could notify the arresting officer and instruct him to

transport the arrestee to a medical facility. However, a Kenosha County Sheriff's Department supervisor was responsible for making the final decision regarding an arrestee's deferral.

Plaintiff also alleges that, during the relevant time period, the Kenosha County Sheriff's Department had a practice of prohibiting female inmates in isolation "O Block" units from having items such as wheelchairs, walkers, or crutches. Further, staff administered medication and food to inmates in the O Block by sliding these items on the floor through a small opening in their cell doors.

### 2.3 Plaintiff's Care at KCJ

Upon Plaintiff's arrival at the KCJ, she was screened by otherwise unnamed Correctional Officer CK #12004 and nurse Autumn Mercer ("Nurse Mercer"). Although both noted Plaintiff's ankle injury, neither decided to defer her incarceration so that she could obtain medical care. Nurse Mercer sent an e-mail to a sheriff supervisor and nurse Joann Medley ("Nurse Medley") informing them of Plaintiff's condition. Nurse Medley recommended that Plaintiff stay in the medical unit and that she use a wheelchair. On January 14, 2014, Dr. Butler spoke to a nurse at the KCJ and, after learning about Plaintiff's injuries, ordered that Plaintiff have crutches and use a wheelchair for long distances only.

Unfortunately, because the medical unit was full, KCJ placed Plaintiff in the O Block, where she went without crutches, a wheelchair, or a walker for three days. Plaintiff states that she crawled to the door to get her food and medication, as well as to use the toilet, to avoid putting weight on her ankle. Plaintiff was released to a non-isolation unit on January 16, where, notwithstanding her injury and reliance on crutches, KCJ staff required her to complete daily chores and other tasks.

Page 4 of 14
Case 2:19-cv-01521-JPS   Filed 09/02/20   Page 4 of 14   Document 64

A couple of days later, after reviewing Plaintiff's medical records, but without examining her, Dr. Butler ordered that Plaintiff have an appointment with Dr. Sockrider. On January 31, he determined that, since Plaintiff's last exam on January 8, 2014, she had an increase in angular deformity of the fracture fragments and a valgus deformity of the ankle. Dr. Sockrider ordered Plaintiff to use a wheelchair or walker and to avoid bearing weight on her injury.

Between January 22 and January 31, Plaintiff submitted approximately four request forms indicating that she was in pain and that she was unable to use her crutches without bearing weight on her ankle. Nevertheless, Dr. Butler renewed her prior order for crutches and a wheelchair only for long distances. When Dr. Butler visited Plaintiff's cell for the first time on February 4, 2014, she noted that Plaintiff wanted a wheelchair because she could not use crutches and that, although Plaintiff was in a cast, she did not complain about pain. Ultimately, Dr. Butler said that Plaintiff was too sedentary and needed to keep moving. Thus, Plaintiff continued to use crutches and could only use a wheelchair for long distances.

Plaintiff eventually received a walker. However, on February 11, 2014, during a visit with Dr. Butler, Plaintiff said that she was in pain, her ankle was swollen, and that she was unable to use the walker without putting weight on her injury. Dr. Butler instructed nurses to check on Plaintiff's swelling. Later that night, KCJ staff wheeled Plaintiff to the health services unit where an unknown employee told Plaintiff that she would contact Dr. Sockrider's office for clarification regarding his prior orders. Nurse Medley also sent an e-mail recommending that Plaintiff be moved to the O Block unit "to enhance [Plaintiff's] safety with mobility and to

improve her ability to care for herself." Plaintiff alleges that from February 12 to February 15 she was in the O Block unit without access to her walker.

On February 25, Plaintiff saw Dr. Sockrider, who again prescribed that Plaintiff bear no weight on her injury and be given a wheelchair. Because KCJ did not immediately follow this order, Plaintiff contacted Disability Rights Wisconsin, who then filed a complaint on her behalf. Plaintiff finally received a wheelchair on or before March 18, 2014.

At Plaintiff's following appointment with Dr. Sockrider, X-rays of Plaintiff's ankle showed a new dislocation and severe widening of her ankle socket. He referred Plaintiff to Dr. Krause, who recommended that Plaintiff have ORIF surgery. Concerned about logistics and Plaintiff's ability to recover at KCJ, Nurse Medley e-mailed the DOC asking whether the DOC had plans to release Plaintiff's probation and parole hold. Nurse Medley also ordered another nurse to call Dr. Sockrider's office to ask whether Plaintiff needed a wheelchair or walker because she was walking with a boot. Dr. Sockrider reiterated that Plaintiff should not bear weight on her ankle.

In late May, a doctor of podiatric medicine, Dr. Yoder, performed Plaintiff's ORIF surgery. He stabilized Plaintiff's outer ankle using a plate and 12 screws and also transferred some of her tendon. Post-surgery, Dr. Yoder ordered Plaintiff to avoid bearing weight on her ankle for a substantial amount of time. He also ordered that she go to a rehabilitation facility for closely monitored treatment. Plaintiff alleges that neither Dr. Butler nor any VNCC or KCJ staff approved this order. Therefore, Plaintiff again contacted Disability Rights Wisconsin to advocate for her transfer to a short-term rehabilitation facility. With the help of Disability Rights Wisconsin and Dr. Yoder, KCJ subsequently transferred Plaintiff to

Clairidge House in Kenosha, where she received rehabilitation services and pain medication from May 30 through August 29, 2014. Meanwhile, VNCC staff, including Nurse Medley, repeatedly called Clairidge House to ask about Plaintiff's progress and whether she could be discharged.

Plaintiff did not begin to bear weight on her ankle until August 1, all the while under the constant supervision of a Clairidge House physical therapist. On August 22, Dr. Yoder faxed a note to KCJ indicating that while Plaintiff had made progress, she was "a high fall risk and [ran] an even higher risk of suffering further damage to the reconstruction . . . ." Concerned that Plaintiff would regress if KCJ transferred her back to a correctional facility, he asked KCJ staff to reconsider. However, the officers ignored his request and brought Plaintiff back to KCJ.

At a September follow-up appointment, Dr. Yoder discovered that Plaintiff was bearing weight on her injury without supervision and in a manner inconsistent with therapist guidelines. Her X-rays also showed a slight widening of her ankle's medial clear space. He ordered that Plaintiff get fitted for a custom brace and that she receive physical therapy sessions two to three times per week for four to six weeks. Notably, Plaintiff did not receive her brace until October 16, *i.e.*, 31 days after Dr. Yoder prescribed it. Plaintiff also had only five physical therapy sessions prior to her transfer out of KCJ. In addition to the aforementioned allegations, Plaintiff also claims that Dr. Butler and VNCC staff allowed her pain control medication to lapse on six different occasions.

In October, KCJ transferred Plaintiff to TCI. Plaintiff avers that the care she received at TCI was also untimely and unpredictable. For example, Plaintiff had to wait 168 days to get fitted for a new brace, all the while putting weight on her injury. When she inquired about additional surgery,

staff told her that her surgical options were limited due to her impending release. Post-release, doctors told Plaintiff that the best medical option for her long-term pain relief and maximum mobility was to have her leg amputated below her knee. Plaintiff's leg was eventually amputated in 2019.

### 3. LEGAL STANDARD

Both ACH and VNCC, respectively, seek dismissal of Plaintiff's complaint, asserting that Plaintiff has "failed to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To state a viable claim, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In other words, a complaint must give "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level[.]" *Kubiak v. City of Chi.*, 810 F.3d 476, 480 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007)) (alteration in original).

When conducting its review, the Court is required to "accept as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff." *Kubiak*, 810 F.3d at 480–81 (citation omitted). However, a complaint that offers "'labels and conclusions'" or "'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). The Court must identify allegations "that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. Ultimately, dismissal is only appropriate "if it appears beyond doubt that

the plaintiff could prove no set of facts in support of his claim that would entitle him to the relief requested." *Enger v. Chi. Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016) (citation omitted).

**4.     ANALYSIS**

**4.1** *Monell* **Overview**

Plaintiff alleges that ACH and VNCC violated her Eighth and Fourteenth Amendment rights. (Docket #1 at 32, 37). In their respective motions to dismiss, both ACH and VNCC correctly assert that there is no *respondeat superior* liability under 42 U.S.C. § 1983. Plaintiff concedes this point in her reply and instead attempts to "demonstrate" that she has successfully pled *Monell* claims against both ACH and VNCC. (Docket #28 at 7, #48 at 7).[2]

In *Monell v. Department of Social Services of City of New York*, the Supreme Court established that the government can be held liable under § 1983 "when the execution of a government's policy or custom, whether made by its lawmakers or those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ." 436 U.S. 658, 694 (1978). Similarly, "a private corporation that has contracted to provide essential government services is subject to at least the same rules that apply to public entities." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378–79 (7th Cir. 2017).

---

[2]Plaintiff alleges facts for the first time in her reply briefs and repackages her initial allegations in an effort to bring viable claims against both ACH and VNCC. *See* (Docket #28, #48). Because "a plaintiff may not amend [her] complaint in [her] response brief," the Court could dismiss Plaintiff's complaint outright as to ACH and VNCC. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011). Because even Plaintiff's reoriented complaint fails to state *Monell* claims against the above-named defendants, the Court analyzes the fully briefed motions to dismiss and ultimately grants the same, (Docket #10, #39).

Therefore, Defendants ACH and VNCC, as government contractors, are not foreclosed from constitutional claims under § 1983. However, in *Monell*, the Supreme Court concluded "that a municipality cannot be held liable *solely* because it employs a tortfeasor–or in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." 436 U.S. at 691 (italics in original). Therefore, "[f]or . . . liability to attach, a constitutional violation must be brought about by (1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with 'final policymaking authority.'" *Terry v. County of Milwaukee*, Case No. 17–CV–1112–JPS, 2018 WL 2567721, *5 (E.D. Wis. June 4, 2018) (quoting *Darchak v. City of Chi. Bd. of Ed.*, 580 F.3d 622, 629 (7th Cir. 2009)). This requirement serves to "distinguish acts of the municipality from acts of [its] employees . . . and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Grieveson v. Anderson*, 538 F.3d 763, 771 (7th Cir. 2008) (internal quotations and citations omitted). Additionally, "to state a § 1983 claim against a municipality, the complaint must allege that an official policy or custom not only caused the constitutional violation, but was 'the moving force' behind it." *Estate of Sims by Sims v. Cty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)).

### 4.1.1 Defendant ACH

In her reply brief, Plaintiff argues that she has properly alleged the third type of *Monell* claim, *i.e.*, that she has pleaded that Dr. Butler was ACH's agent and that Dr. Butler had final policymaking authority. Plaintiff has undeniably pleaded facts in support of her claim that Dr. Butler was ACH's agent. For example, Plaintiff stated that ACH hired Dr. Butler to be

its sole medical director at the KCJ and Kenosha County Detention Center. As the health authority, Dr. Butler approved and implemented patients' plans of care and supervised the delivery of healthcare services. (Docket #1 at 10). Notably, Plaintiff stated that ACH was responsible for adopting, implementing, and enforcing policies and practices pertaining to medical care for the KCJ. (*Id.* at 5).

"The fact that a particular official–even a policymaking official–has discretion in the exercise of particular functions does not, without more, give rise to . . . liability based on an exercise in that discretion." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–82 (1986). The Supreme Court explained that "[t]he official must also be responsible for establishing final . . . policy respecting such activity" before liability attaches. *Id.* at 482–83. The Court finds that Plaintiff has not pleaded sufficient facts that would allow the Court to reasonably infer that Dr. Butler possessed final policymaking responsibilities for ACH.

Plaintiff argues that she sufficiently pleaded that Dr. Butler is a decision-maker. (Docket #28 at 8). In fact, Plaintiff's complaint is littered with references to both Dr. Butler's orders and failures to order certain courses of treatment on Plaintiff's behalf. *See generally* (Docket #1 at 10–26, 29–32). However, this circuit has made clear that "policymaking is broader than decision-making." *Darchak*, 580 F.3d at 630. "[S]imply because a municipal employee has decisionmaking [sic] authority, even unreviewed authority, with respect to a particular matter does not render him a policymaker as to that matter . . . . A municipality must have delegated authority to the individual to make policy on its behalf." *Ball v. City of Indianapolis*, 760 F.3d 636, 643–44 (7th Cir. 2014) (citation omitted) (affirming the district court's dismissal of *Monell* claim against both the city and its

police department because a city detective's role as the final decision-maker with regard to the contents of an erroneous affidavit did not render him a policymaker); *see also Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 781 (7th Cir. 2011) (dismissing *Monell* claim at summary judgment stage because it was clear that the city had not delegated authority to either the director or board of the local senior center to impose punishment for rule violations).

Thus, Plaintiff's allegations, without more, are insufficient. Plaintiff has not alleged that Dr. Butler had final policymaking authority on behalf of ACH. Nor has she pleaded facts that would lead the Court to infer that ACH delegated such authority to Dr. Butler. Therefore, it is unnecessary for the Court to analyze causation at this time.

### 4.1.2 Defendant VNCC

In Count Two of Plaintiff's complaint, she alleged that her rights were violated and that her damages were directly caused by "Nurse Mercer, Nurse Medley, and Unknown Employees of VNCC/KVNA, acting within the scope of their employment at VNCC/KVNA." (Docket #1 at 37). Plaintiff then attempts to use her reply brief to establish that she properly alleged that her rights were violated "as the result of the choices and decisions of a policymaker to whom authority was delegated." (Docket #48 at 7). Specifically, that "Nurse Medley instituted a policy of avoiding costly but necessary medical care and made decisions consistent with this policy." (*Id.* at 7–8). Plaintiff's complaint is void of allegations that would support this claim.

Plaintiff has not alleged that VNCC gave Nurse Medley policymaking authority anywhere in her complaint. Rather, Plaintiff described Nurse Medley as "a licensed registered nurse" who, by way of her employment with VNCC, "was responsible for the health and welfare

Page 12 of 14
Case 2:19-cv-01521-JPS   Filed 09/02/20   Page 12 of 14   Document 64

of those confined in the KCJ." (Docket #1 at 7). She stated that VNCC was "responsible for adopting, implementing, and enforcing policies and practices pertaining to medical care for the KCJ." (*Id.* at 6). To get around the lack of delegation from VNCC to Nurse Medley, Plaintiff purports that Nurse Medley's e-mails to the DOC to ask about Plaintiff's potential release or Nurse Medley's calls to Dr. Sockrider's office to discuss Plaintiff's return to KCJ were decisions "made out of a desire to save . . . money rather than to provide constitutionally mandated care" and, thus, established policy on KCJ's behalf. (Docket #48 at 8).

First, the Court points out that there is no mention of delegation of policymaking authority from VNCC to Nurse Medley in Plaintiff's complaint. Second, the Court has serious reservations about concluding that Nurse Medley's decisions to send e-mails or make phone calls is the equivalent of making policy or establishes Nurse Medley as a policymaker. Further, Plaintiff's complaint stated that other employees also sent e-mails and made phone calls on Plaintiff's behalf. If the Court followed Plaintiff's logic, the Court must consider these nurses and employees to be policymakers as well. Ultimately, Plaintiff has failed to state a claim for relief with regard to VNCC.

## 5.  CONCLUSION

In light of the foregoing, the Court grants both ACH and VNCC's respective motions to dismiss for failure to state a claim. (Docket #10, #39). However, the Court gives Plaintiff leave to amend her complaint. *See* Fed. R. Civ. P. 15(a)(2). Lastly, the Court addresses the parties' joint motion to adjourn the existing scheduling order and to set a status conference, (Docket #63). The Court will grant the parties' request to adjourn the existing trial scheduling order. (Docket #51). However, given the yet

unknown breadth, depth, and trajectory of the continued COVID-19 pandemic, the Court will not set a status conference to determine a new trial date and any other related dates and deadlines.

Accordingly,

**IT IS ORDERED** that Defendant Advance Correctional Health Care, Inc.'s motion to dismiss (Docket #10) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendants Visiting Nurse Community Care, Inc. and Kenosha Visiting Nurse Association, Inc.'s motion to dismiss (Docket #39) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that, should Plaintiff choose to file an amended complaint, she must do so on or before **September 23, 2020**; and

**IT IS FURTHER ORDERED** that the parties' joint motion to adjourn the existing scheduling order and set a status conference (Docket #63) be and the same is hereby **GRANTED in part** and **DENIED in part**, as provided herein.

Dated at Milwaukee, Wisconsin, this 2nd day of September 2020.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge